IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 2, 2021 Session

**STATE OF TENNESSEE v. JAMAURI RANSOM**

**Appeal from the Circuit Court for Madison County**
**No. 19-86     Roy B. Morgan, Jr., Judge**

_____

**No. W2019-02310-CCA-R3-CD**

_____

The Defendant, Jamauri Ransom, was convicted by a jury of aggravated robbery and first-degree felony murder, and he received an effective sentence of life imprisonment. On appeal, the Defendant challenges the sufficiency of the evidence supporting his felony murder conviction, asserting that this court should apply to the present case our supreme court's rejection of the "continuous offense theory" for robbery as discussed in State v. Owens, 20 S.W.3d 634 (Tenn. 2000); that the aggravated robbery and felony murder were separated by intervening circumstances; and that the State failed to negate his theory of self-defense. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Patrick S. Rader, Assistant Public Defender, Tennessee District Public Defenders Conference, Franklin, Tennessee (on appeal); and George Morton Googe, District Public Defender, and Jeremy B. Epperson, Assistant District Public Defender, Jackson, Tennessee (at trial), for the appellant, Jamauri Ransom.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Lee R. Sparks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises from the Defendant's alleged involvement in a drug sale and shooting that took place at Marathon gas station in Jackson, Tennessee, during the evening hours of April 15, 2018. In relation to these events, a Madison County grand jury indicted

the Defendant for first-degree felony murder of Kevin Minter and aggravated robbery of Cardierre Miller. See Tenn. Code Ann. § 39-13-202, -402

At trial, the following proof was presented. On the evening of April 15, 2018, Mr. Miller and Mr. Minter were at Huck's gas station in Jackson. According to Mr. Miller, while there, he put gas in his Hyundai Accent, and Mr. Minter sold some marijuana. In addition, Mr. Miller encountered Mr. Davante Harris while at the gas station; Mr. Harris was at the gas station to get gas and pizza. Mr. Miller said that he recognized Mr. Harris because the two men had previously worked together at Kellogg's.[1] Mr. Miller informed Mr. Harris that his friend had some "loud" for sale, which was slang for high quality marijuana. Though Mr. Harris did not purchase any marijuana at that time, Mr. Harris seemed interested, so Mr. Miller gave Mr. Harris his phone number.

Later that evening, Mr. Harris called Mr. Miller to purchase some marijuana before he left Jackson and headed to Memphis, and they agreed to meet at a local Marathon gas station. Mr. Miller, still accompanied by Mr. Minter, arrived at the Marathon and parked next to a white Nissan Altima, which was parked at the gas pumps. The Altima was being driven by Mr. Harris; Dedrick House[2] was in the front passenger seat; and the Defendant was in the backseat behind Mr. Harris. It was dark outside, and the cars were parked facing each other.

Though the two parties initially quarreled over who would get out of their respective vehicles, Mr. Miller acquiesced and left his vehicle to sell the marijuana while Mr. Minter stayed in the car. Mr. Miller entered the Altima on the rear passenger's side of the vehicle and sat in the backseat with the Defendant, who was the person interested in purchasing the marijuana. The Defendant showed Mr. Miller the money and then asked Mr. Miller to weigh the marijuana. Mr. Miller complied and placed the marijuana on the scale that was in the middle "between the seats" and already present in the car prior to Mr. Miller's entry. According to Mr. Miller, as soon as he put the marijuana on the scale the Defendant pulled out a handgun and instructed Mr. Miller "to give him everything" or the Defendant would shoot. Mr. Harris testified that the Defendant said to Mr. Miller, "Give me that," and that cussing, "b---hing," and wrestling ensued between Mr. Miller and the Defendant. Mr. Miller stated that in response to the Defendant's actions, he put hands up and asked of the Defendant, "[S]o you gonna do me like that, you gonna do me like that[?]" Mr. Miller tried to grab the marijuana and reclaim possession, but when the bag "busted everywhere," Mr. Miller decided to abandon the enterprise and get out of the car because he felt threatened and feared for his life.

---

[1] Mr. Harris testified to the contrary, stating that he was unfamiliar with Mr. Miller.

[2] Though only Mr. House's last name was given at trial, the affidavit of complaint provides that this witness's full name is Dedrick House.

Mr. Minter, who was armed with a 9mm handgun with an extended magazine, observed the events taking place in the adjacent vehicle and got out of Hyundai in an attempt to aid Mr. Miller, who was still inside the car. As Mr. Minter exited his vehicle, he was backing away from the Altima, and according to Mr. Miller, Mr. Minter had the gun pointed in the Altima's direction "raised up ready to use." Mr. Harris described that Mr. Minter was standing in front of the Altima, that the gun was pointed at Mr. Harris's face, and that he was scared of being shot by Mr. Minter. As Mr. Miller was exiting the Altima, the Defendant, almost simultaneously, opened fire on Mr. Minter using a .45 "auto-caliber" handgun. The Defendant shot from the passenger-side rear door and hit Mr. Minter in the head.

After the shooting, the Altima fled the scene. The incident at the Marathon gas station was captured on surveillance video, which was shown to the jury, and reflected that the entire encounter was brief in nature. The video showed that only thirty-three seconds passed between Mr. Miller's getting in the backseat of the Altima and Mr. Minter's getting out of the Hyundai with his gun. Mr. Minter lay on the concrete shot in the head only four seconds after exiting the vehicle.

According to Mr. Harris, the three-man group proceeded to Memphis following the incident. In the days that followed, the Defendant was arrested while carrying a .45-caliber handgun.

According to Mr. Harris, his Altima was struck by a bullet. Review of the photographs from the crime scene indicated observable damage to Mr. Miller's Hyundai from several bullet strikes. Also, three .45-caliber shell casings were found on the ground at the Marathon, and one .45-caliber projectile was found in the backseat floorboard of Mr. Miller's vehicle. In addition, one 9mm shell casing was found at the scene. It was determined that these casings and the projectile were fired through the respective weapons at issue in this case. Though a projectile was later discovered in Mr. Minter's clothing, it was not tested for comparison.

Mr. Minter died from a single "through-and-through" gunshot to the head. While on the scene, officers found a bag of marijuana on Mr. Minter's person. Also, Mr. Minter's subsequent blood test was positive for marijuana.

In Mr. Miller's subsequent police statement at the Jackson Police Department, Mr. Miller advised the authorities that when the vehicle first pulled up, he asked the two Black males inside if they had any marijuana for purchase, but before he could purchase the marijuana, the two men pulled guns on him and tried to rob him. Mr. Miller further said that the two men "then started shooting at him and his friend" and that someone stole $40 from him at the scene. Mr. Miller admitted that he lied several times during the statement,

including why he picked up Mr. Minter's weapon, but then returned Mr. Minter's gun to the ground.

At trial, Mr. Miller indicated that he was unfamiliar with either Mr. House or the Defendant. Mr. Miller confirmed that he had a previous 2018 conviction for possession of marijuana with intent to sell or deliver, that he was not charged with anything related to the drug sale in this case, and that his probation was violated partly due to his inability to be truthful about this case. On cross-examination, the defense played a rap video Mr. Miller made that showed Mr. Minter with a gun that looked like the gun Mr. Minter had at the gas station, though Mr. Miller also said that he had never seen Mr. Minter's gun before. Also, in the video, Mr. Miller rapped about his selling drugs to get rich, shooting any person who got in the way of that enterprise, and always carrying a weapon for protection.

Mr. Harris also gave a subsequent police statement following the shooting, wherein he relayed information similar to this trial testimony. However, Mr. Harris indicated in his statement that he thought Mr. Minter and Mr. Miller were trying to rob them at the Marathon that evening.

At trial, Mr. Harris testified that he and Defendant were merely acquaintances, that the Defendant was a friend of Mr. House's, and that he was simply giving the Defendant a ride back to Memphis when they stopped at the Marathon. Mr. Harris also claimed that he had no prior knowledge that the Defendant was in possession of handgun. Mr. Harris confirmed that he had been charged in relation to the shooting, that those charges were still pending, and that he had been "promised . . . that everything would go well" for him in that case if he testified against the Defendant.[3]

Relative to who fired the gunshots first, Mr. Miller said that he heard gunshots, though he did not see whether Mr. Minter or the Defendant fired first. Mr. Miller confirmed, however, that the shot that killed Mr. Minter came from the backseat of the Altima. Then, Mr. Harris testified that the first weapon he saw was Mr. Minter's when Mr. Minter approached the Altima, which caused him to duck under the steering wheel. Therefore, Mr. Harris had "no idea" whether it was Mr. Minter or the Defendant who fired first, though Mr. Harris acknowledged that only Mr. Minter and the Defendant displayed a gun and that it was the Defendant who shot and killed Mr. Minter.

After the Defendant's arrest, Jackson Police Sergeant Adam Pinion interviewed the Defendant on April 26, 2018. The Defendant confirmed that he was with Mr. Harris and Mr. House on the evening of April 15, 2018, headed to Memphis and that prior to leaving

---

[3] The record indicates that Mr. Harris subsequently pled guilty to being an accessory after the fact and received a sentence of two years' probation.

Jackson, they stopped at Marathon gas station to purchase some marijuana from Mr. Miller, whom they had encountered earlier in the evening. The Defendant relayed that Mr. Miller pulled up in his car, which had tinted windows, and that Mr. Miller "let down the front passenger[-]side window just a little bit" and motioned for the Defendant to get into Mr. Miller's car. However, because the Defendant did not know Mr. Miller, he motioned for Mr. Miller to get in the car with them instead. Mr. Miller complied and got out of his car and sat in the backseat of Mr. Harris's car with the Defendant. According to the Defendant, Mr. Miller then placed approximately seven grams of marijuana on the scale in the car, and the Defendant took about four grams from the scale and "told him let me get that." Mr. Miller "started trying to get the weed back and then he opened the door and ran off." At that time, Mr. Minter "got out of the passenger[']s side of the other car and started shooting" at the Altima, so the Defendant pulled out his gun from his backpack between his legs and returned fire by shooting out of the rear passenger-side door. The Defendant said that he fired two or three "scared shots" and that he "wasn't looking when [he] shot." The Defendant confirmed that they then drove off and that he used a silver .45 caliber handgun.

Following the conclusion of proof, the jury convicted the Defendant of both offenses as charged. The trial court sentenced the Defendant to life in prison for his felony murder conviction and to a concurrent sentence of twelve years for his aggravated robbery conviction. The Defendant timely appealed.

ANALYSIS

On appeal, the Defendant contends that the evidence was insufficient to sustain his first-degree felony murder conviction "because the killing of Mr. Minter was a distinct act, collateral to the robbery of Mr. Miller, and was done only in self-defense and defense of others."[4] Specifically, the Defendant asserts that this court should apply to the present case our supreme court's rejection of the "continuous offense theory" for robbery as discussed in State v. Owens, 20 S.W.3d 634 (Tenn. 2000); that the aggravated robbery and felony murder were separated by intervening circumstances; and that the State failed to negate his theory of self-defense. The State rejects each of these allegations and responds that the evidence is sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has

---

[4] The Defendant does not challenge the sufficiency of the evidence supporting his aggravated robbery conviction.

resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Here, the Defendant was convicted of first-degree felony murder which is defined, for purposes of Defendant's conviction, as the killing of another in the perpetration of an aggravated robbery. Tenn. Code Ann. § 39-13-202(a)(2). Aggravated robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" and is "accomplished with a deadly weapon or by display of any

article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1).

The Defendant first asks this court to "apply the Tennessee Supreme Court's rejection of the continuous offense theory in Owens to felony murder in this case because the act that caused Mr. Minter's death occurred after the robbery was already complete." According to the Defendant, relying on Owens and its progeny, "[t]he Tennessee Supreme Court has repeatedly held that violence, occurring after the taking of property, is a distinct offense from the taking itself and that any violence used thereafter does not extend the offense of robbery past the taking of the property." The Defendant concludes that if this court applies this precedent to the present case, the evidence does not support his felony murder conviction.

In Owens, the defendant stole clothing from a retail store. 20 S.W.3d at 641. After fleeing security personnel for at least five blocks, he turned, dropped the clothing, and threatened a pursuing security guard with a box cutter. Id. On appeal, our supreme court considered "the temporal relationship required between the taking and the act of violence or putting a person in fear as they together constitute the offense of robbery defined in" Tennessee Code Annotated section 39-13-401. Id. at 637.

The Owens Court held that the defendant was not guilty of robbery because his "use of violence or fear was subsequent to the taking and temporally remote." 20 S.W.3d at 641. The court "adopted the common law rule" and interpreted the robbery statute as requiring that such violence or fear "precede or be concomitant to or contemporaneous with the taking of property to constitute robbery." Id. at 637. The court adopted this interpretation rather than the "continuous offense theory" used in many jurisdictions, which "interpret[s] robbery as a continuous offense 'that is not complete until the perpetrator reaches a place of temporary safety.'" Id. at 638-39 (quoting Ball v. State, 699 A.2d 1170, 1183-85 (Md. 1997)). Under the continuous offense theory, "a robbery is committed, not only if the perpetrator uses force or intimidation to 'take' possession of the property, but also if force or intimidation is used to retain possession immediately after the taking, or to carry away the property, or to facilitate escape." Id. at 639 (quoting State v. Meyers, 620 So.2d 1160, 1163 (La. 1993)). The court noted that "an overwhelming majority [of continuous offense theory jurisdictions] have [adopted that theory] with the help of statutes which specifically define robbery to include the use of force to retain property or to escape." Id. Because Tennessee Code Annotated section 39-13-401(a) does not define robbery in this way, our supreme court declined to adopt the continuous offense theory, instead applying the common law rule stated above.

Seventeen years later, in State v. Henderson, the Tennessee Supreme Court considered whether the victim of an especially aggravated robbery must suffer the serious bodily injury before the accused has completed the robbery. 531 S.W.3d 687, 689 (Tenn.

2017). After considering the plain language of the especially aggravated robbery statute, the court concluded that this statute "does not specify at what point in time the serious bodily injury must be suffered by the victim." Id. at 692. The court applied the basic rules of statutory interpretation and reasoned that the legislature, in drafting the especially aggravated robbery statute, "intended that the underlying robbery offense be considered complete at some discrete point in time." Id. at 693. After considering the construction and interpretation of the especially aggravated kidnapping and especially aggravated burglary statutes that also contain the element "where the victim suffers serious bodily injury," the court concluded that "the victim of an especially aggravated robbery must suffer his or her serious bodily injury during the commission of the underlying theft, i.e., before the accused has completed the theft of property." Id. at 694.

However, the Henderson Court swiftly recognized that this conclusion "simply posits another question: at what point is the theft underlying a robbery complete?" 531 S.W.3d at 694. After conducting an evaluation of legal precedent, including Owens, the court identified the specific point in time when a robbery is complete:

> [W]e hold that a robbery accomplished with a deadly weapon is complete once the accused has completed his theft of all the property he intended to steal. If the victim suffers serious bodily injury during the commission of the robbery, the offense may constitute especially aggravated robbery. It is appropriate to consider the accused's conduct and intent when determining whether the underlying theft has been completed.

Id. at 698.

The Henderson Court then recognized that the uncontroverted proof in that case established that the defendant brandished a gun and demanded that the victim give him his wallet, his cellphone, and his keys. 531 S.W.3d at 698. Once the victim complied with this demand, the defendant stayed at the scene and began discussing with his cohort what to do with the victim. Id. The court concluded that the defendant's conduct in requesting the victim's keys, remaining at the scene, and demanding that the victim get in the trunk of the car supported an inference that the defendant had not completed his intended theft of the victim's car at the time that the victim began to struggle with the defendant, which resulted in the victim's being shot four times. Id. Because the defendant's conduct demonstrated that he had not completed his intended theft at the time that the victim sustained his serious bodily injury, the court held that the victim had, in fact, suffered his serious bodily injury during the commission of the robbery with a deadly weapon and that the evidence was sufficient to sustain the defendant's conviction for especially aggravated robbery. Id.

- 8 -

The Defendant urges this court to extend the legal principles from Owens and Henderson to this case and to "hold that any violence committed after a robbery is completed" is distinct from the robbery and not "in perpetration of" the robbery. The State responds that this court is bound to follow the Tennessee Supreme Court precedent of State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005), and State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999), as it specifically relates to construction of the felony murder statute and must decline the Defendant's invitation to impose a contrary construction.

Relative to the precedent of which the State speaks regarding construction of the felony murder statute, this court has explained,

It is well established that before a killing will "fall within the definition of felony murder, [it] must have been 'done in pursuance of the unlawful act, and not collateral to it.'" State v. Banks, 271 S.W.3d 90, 140 (Tenn. 2008) (citing State v. Rice, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting Farmer v. State, 296 S.W.2d 879, 883 (1956))). "In other words, 'The killing must have had an intimate relation and close connection with the felony . . . , and not be separate, distinct, and independent from it[.]'" Farmer, 296 S.W.2d at 883 (quoting Wharton on Homicide, § 126 (3rd ed.)); see also, e.g., Banks, 271 S.W.3d at 140; []Thacker, 164 S.W.3d [at] 223 []. To satisfy the requirement of "an intimate relation and close connection," "the killing 'may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action.'" Thacker, 164 S.W.3d at 223 (quoting []Buggs, 995 S.W.2d [at] 106 []). Moreover, "there should be a causal connection between the killing and the felony." Buggs, 995 S.W.3d at 106 (citing Farmer, 296 S.W.2d at 884; State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). Requiring a causal connection between the homicide and the underlying felony promotes the deterrent effect of the rule by precluding a first-degree murder conviction for "killings which are collateral to and separate from the underlying felony." State v. Pierce, 23 S.W.3d 289, 295 (Tenn. 2000). "Moreover, requiring a close nexus between the [underlying felony] and the killing is particularly appropriate given that the felony murder rule is 'a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder.'" Id. (quoting Buggs, 995 S.W.2d at 107).

A killing will be considered to have been committed "in the perpetration of" the underlying felony "where the homicide is so closely connected with the underlying felony as to be within the res gestae thereof,

or where the homicide is so linked to the felony as to form one continuous transaction." Buggs, 995 S.W.3d at 106 (citing 40 Am. Jur. 2d Homicide § 67 (1999)). "The res gestae embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to the transaction and having a direct causal connection with it, as well as acts immediately following it and so closely connected as to form in reality a part of the occurrence." State v. Patrick Wingate, No. M1999-00624-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App. [] May 25, 2000) (citing Payne v. State, 406 P.2d 922, 925 (Nev. 1965)). [For example,] [w]hen the predicate felony is theft, the killing must be "closely connected to the initial taking of the property in time, place, causation, and continuity of action." See Pierce, 23 S.W.3d at 296 (citation omitted).

State v. Joseph Egan Underwood, No. E2013-01221-CCA-R3-CD, 2014 WL 891037, at *11 (Tenn. Crim. App. Mar. 6, 2014); see also State v. Antoine Hinton, No. W2018-01931-CCA-R3-CD, 2020 WL 1426683, at *12-13 (Tenn. Mar. 19, 2020), perm. app. denied (Tenn. Sept. 21, 2020).

Now, we turn to an analysis of the two lines of precedent cited by the parties. As noted above, the determination of when a robbery is complete is not dependent upon whether the perpetrator has gained a place of temporary safety, as it does in jurisdictions using the continuous offense theory. See Owens, 20 S.W.3d at 638-39. However, our supreme court has indicated that this remains an important consideration in determining whether a killing was committed in the perpetration of a felony. See Pierce, 23 S.W.3d at 295. The Pierce defendant stole a vehicle and, twenty days later, perpetrated a killing with the vehicle while fleeing from police. Id. at 290. The supreme court found the evidence insufficient for felony murder because the defendant had gained a place of temporary safety before the fatal pursuit began, conclusively indicating that "the killing was completely unconnected to the initial taking of the vehicle[.]" Id. at 297.

Before reaching its ultimate conclusion, the Pierce Court observed the following legal principles:

If the felony and killing occur as part of a continuous criminal transaction, the felony murder rule applies. However, where there is a break in the chain of events between the felony and the killing, the felony murder rule does not apply. One of the most important factors to consider in determining whether there has been a break in the chain of events that would preclude application of the felony murder rule is whether the felon has reached a place of temporary safety. If the felon has gained a place of temporary safety after commission of the felony and before the killing, the felony murder rule generally does not apply.

<u>Pierce</u>, 23 S.W.3d at 294-95 (citations omitted).  Furthermore, the court observed "that in determining whether the evidence is sufficient to support a conviction of first-degree murder in the perpetration of theft, a court must determine whether the killing is closely connected to the <u>initial</u> taking of the property in time, place, causation, and continuity of action."  <u>Id.</u> at 295 (citations omitted).  Finally, we note that in support of the determination that the evidence was insufficient in that case, the court noted the holding in <u>Owens</u> that robbery is committed only if the use of violence or fear precedes or is contemporaneous with the taking of property, and cited to <u>Owens</u> for comparison, indicating that <u>Owens</u>, by analogy, would provide support for its proposition.  <u>Id.</u> at 296 (citing <u>Owens</u>, 20 S.W.3d 634).

It is against this backdrop that we agree with the Defendant that our supreme court's precedent in <u>Thacker</u> and <u>Buggs</u> does "not put forward the strict all-or-nothing rule that the State suggests" and that in some instances, <u>Owens</u> and <u>Henderson</u> could provide analogous support for such arguments based upon temporal proximity between the robbery and killing.  However, this is where our agreement with the Defendant ceases.  We also do not think this precedent requires this court to apply our supreme court's rejection of the continuous offense theory to felony murder cases.  Despite the parties' claims to the contrary, we believe that the holdings from these two lines of cases can coexist.  The legal principles cited in <u>Pierce</u> are illustrative of just such a proposition.  <u>See also</u> State v. State v. Jamaal Austin, No. W2017-01632-CCA-R3-CD, 2018 WL 4849141 (Tenn. Oct. 5, 2017) (reversing a defendant's especially aggravated robbery conviction based upon <u>Henderson</u> but affirming the felony murder conviction for a killing committed during the perpetration of an aggravated robbery).  Accordingly, the Defendant's argument regarding the application of <u>Owens</u> to the present case is not determinative of whether he is entitled to relief.

Next, the Defendant contends that "[e]ven if this [c]ourt declines to apply <u>Owens</u> and its progeny to felony murder, it still should find that the evidence was legally insufficient to support [the Defendant's] felony murder conviction because the aggravated robbery and the killing were separated by intervening circumstances that broke the chain of events."  The Defendant asserts, "Because the taking of Mr. Miller's marijuana was completed before the killing of Mr. Minter and was separated by intervening circumstances, the killing of Mr. Minter could not have been committed in perpetration of the robbery of Mr. Miller."  The State disagrees.

Though the legal principles of <u>Pierce</u> were illustrative for the purposes of reaching our conclusion above, that is where its usefulness ends.  Our supreme court in <u>Pierce</u> in reaching its conclusion that the evidence was insufficient to support the defendant's felony murder conviction was faced with a set of facts distinguishable from the present case.  In <u>Pierce</u>, a friend of the defendant stole her mother's van in Florida while the defendant and

his girlfriend were in the car. 23 S.W.3d at 291. The trio spent the next three weeks staying either with the friend's grandmother or in local motels in the Bristol, Virginia area. Id. During this time, the defendant and his friends spent a considerable amount of time driving around the adjoining counties in the stolen van. Id. Twenty days later, the police spotted the van and a chase ensued, extending from Virginia into Tennessee. Id. at 291-92. Finally, the police were able to get in front of the van and establish a road block. Id. at 292. Rather than stopping, the defendant drove the van into the parked police car, killing the officer standing behind the vehicle. Id.

In Pierce, the property in question was stolen three weeks before and six hundred miles away from the collision. 23 S.W.3d at 297. Moreover, the defendant and his friends had reached a "place of temporary safety," residing in the Bristol, Virginia area nearly three weeks prior to the collision. Id. During this time, the defendant was neither hiding from nor pursued by the police. Id. Based on these facts, the court concluded that the evidence was insufficient to support a felony murder conviction. Id. Although there was a causal connection between the theft and the collision in that the defendant did not want to be apprehended in connection with the van's theft, the court concluded that the collision was "completely unconnected to the initial taking of the vehicle in time, place, and continuity of action." Id.

However, the facts in this case warrant a different conclusion from that reached in Pierce. Here, the Defendant, while catching a ride back to Memphis on April 15, 2018, met with two men at a Marathon gas station in order to purchase marijuana. After some discussion about which party would leave their respective vehicles to effectuate the sale, Mr. Miller got into the backseat of Mr. Harris's vehicle with the Defendant. The Defendant showed Mr. Miller the money and then asked Mr. Miller to weigh the marijuana. According to Mr. Miller, when he placed the marijuana on the scale, the Defendant pulled out a handgun and instructed Mr. Miller "to give him everything" or the Defendant would shoot. Mr. Harris testified that the Defendant said to Mr. Miller, "Give me that," and that cussing, "b---hing," and wrestling ensued between Mr. Miller and the Defendant. Mr. Miller tried to grab the marijuana and reclaim possession, but when the bag "busted everywhere," Mr. Miller decided to abandon the enterprise and get out of the car because he felt threatened and feared for his life. Mr. Miller exited the vehicle, and his friend, Mr. Minter, observing this from an adjacent vehicle, got out of his vehicle and attempted to aid his friend. The Defendant shot Mr. Minter killing him with a single "through-and-through" shot to the head with a .45-caliber handgun.

Despite the Defendant's assertions to the contrary, we conclude that there were no intervening factors between the robbery of Mr. Miller and the shooting of Mr. Minter. The shooting of Mr. Minter occurred just seconds after Mr. Miller exited Mr. Harris's vehicle and attempted to reach a place of safety. Though the Defendant cites Mr. Minter's

"initiation of the gun fight" as an intervening circumstance, it is in fact quite the opposite. Once Mr. Minter exited Mr. Miller's with his weapon "raised up ready to use," the Defendant fired at Mr. Minter in order to complete the robbery and effectuate his escape from the Marathon.

The Defendant observes that "this [c]ourt has periodically held that violence used to facilitate escape from the robbery scene or to retain possession of the stolen property is part of the offense of robbery and can constitute felony murder." However, the Defendant would have us reject this line of caselaw that discusses the ensuing flight from a robbery and its application to a conviction for felony murder. The Defendant again asks us to extrapolate from the holdings of Owens and Henderson and apply them to felony murder because our supreme court has repeatedly held "that a robbery is complete at the taking of the victim's property." First, we note that the cases to which the Defendant cites discuss flight as part of the felony-murder doctrine and not in regards to a separate robbery conviction. Moreover, as we have discussed above, the Defendant's argument regarding Owens and Henderson is not as cut and dry as he would have this court believe.

We reiterate here the legal principles from Pierce that we have discussed above. Pierce states that where there is a break in the chain of events between the felony and the killing, the homicide will not fall within the felony-murder doctrine. 23 S.W.3d at 295 (internal citations omitted). Moreover, "[o]ne of the most important factors to consider in determining whether there has been a break in the chain of events that would preclude application of the felony murder rule is whether the felon has reached a place of temporary safety." Id. (citation omitted). "If the felon has gained a place of temporary safety after commission of the felony and before the killing, the felony murder rule generally does not apply." Id. (citation omitted).

The causal connection between the underlying felony and the killing also depends upon the character of the underlying felony. State v. Raymond Lee Swett, Jr., No. M2011-00439-CCA-R3-CD, 2013 WL 53993, at *14 (Tenn. Crim. App. Jan. 4, 2013). For example, our courts have consistently held in cases when the predicate felony was robbery that because "asportation is an element of robbery, the felony is still in progress while the defendant is fleeing from the scene with the stolen property." Id. (citing State v. Lee, 969 S.W.2d 414, 416-17 (Tenn. Crim. App. 1997; see also State v. Brown, 756 S.W.2d 700, 702-03 (Tenn. Crim. App. 1988) (holding that the fact that robbery was complete before the victim was killed did not make the murder "collateral" to the robbery where defendant picked up the victim with the intent of robbing him and killed him to prevent identification); State v. Hopper, 695 S.W.2d 530, 535-36 (Tenn. Crim. App. 1985) (holding that "because the murder occurred during the robbers' flight from the scene of the robbery and because their flight was 'part and parcel' of the robbery event, the murder occurred in the perpetration of the robbery")). When the predicate felony is theft, the killing must be

- 13 -

"closely connected to the initial taking of the property in time, place, causation, and continuity of action." Pierce, 23 S.W.3d at 296 (citing Lester v. State, 737 So.2d 1149, 1151 (Fla. Dist. Ct. App. 1999) (holding that the felony murder rule does not apply when the defendant, fleeing from police in a vehicle stolen by another person, collided with another car, killing the driver); Allen v. State, 690 So.2d 1332, 1334 (Fla. Dist. Ct. App. 1997) (holding that the felony murder rule does not apply when the defendant, while driving a stolen vehicle, was involved in a car accident that resulted in the other motorist's death); Doane v. Commonwealth, 237 S.E.2d 797, 798 (Va. 1977) (holding that the felony murder rule does not apply where the defendant stole a car one day and the next day had an automobile accident in the stolen vehicle which resulted in the death of one of the passengers in the stolen vehicle); Montague v. Commonwealth, 522 S.E.2d 379, 381 (Va. Ct. App. 1999) (holding that the felony murder rule does not apply to a killing that resulted when the defendant, in a vehicle he had stolen the previous day, fled from police who had attempted to stop him for making a u-turn and struck another vehicle)). This court upheld a conviction of felony murder in the perpetration of an aggravated burglary when the homicide "occurred at the victim's residence within ten to fifteen minutes" of the initial illegal entry of the residence. State v. Michael Lynn Stanton, No. E2003-02675-CCA-R3-CD, 2005 WL 876873, at *11 (Tenn. Crim. App. Apr. 15, 2005). "In short, whether there is a sufficient causal connection between the felony and the homicide depends on whether the principal's felony dictated his or her conduct which led to the homicide." Swett, 2013 WL 53993, at *14 (quoting Marshall v. United States, 623 A.2d 551, 560 (D.C. 1992)).

We find guidance in the facts of this case from Swett. In Swett, the defendant committed an aggravated burglary of one victim's apartment, and after he had completed that burglary and was near the entrance of the apartment complex, he was confronted by a different victim, whom he killed. 2013 WL 53993, at *2-3. Noting that it was the aggravated burglary of the first victim—the underlying felony—that "prompted [the second victim] to challenge the defendant" and that the defendant had not yet withdrawn to a place of safety before he killed that second victim, this court found that there was a causal connection between the killing of the second victim and the aggravated burglary. Id. at *15. Like the second victim in Swett, Mr. Minter was prompted by the aggravated robbery of another victim to intervene in the situation before the defendant had withdrawn to a place of safety, there was a causal connection between the killing of Mr. Minter and the robbery of Mr. Miller, and the killing of Mr. Minter constituted felony murder. Here, it is no of consequence to our sufficiency analysis that Mr. Miller was the victim of the robbery and Mr. Minter was the victim of the shooting; a fact duly noted by the Defendant.

Here, the Defendant committed the crime of aggravated robbery by stealing Mr. Miller's marijuana while displaying a deadly weapon, and the Defendant does not challenge his conviction of aggravated robbery. The killing of Mr. Minter was part and parcel of the robbery itself, occurring just moments after Mr. Miller exited the car. The

killing did not occur during flight from the scene in order to avoid detection or during a pursuit by law enforcement; it occurred on the scene of the robbery itself. Based on the facts before us, we conclude that there was sufficient evidence to support a trier of fact's finding that the killing was committed in the perpetration of aggravated robbery. In this case, the Defendant did not gain a place of temporary safety between his commission of aggravated robbery and the killing of the victim. The robbery was also closely connected to the killing in both time and place; the victim was killed almost immediately after Mr. Miller exited Mr. Harris's car after the Defendant had pulled a gun on him and stolen his marijuana. The killing was also causally connected to the aggravated robbery in the sense that it was motivated by a desire to retain possession of the marijuana, flee the scene, and evade any consequences from the robbery. Finally, the killing was certainly connected to the robbery in continuity of action, and it took place as a part of a "continuous criminal transaction." Pierce, 23 S.W.3d at 294; see also State v. Chico McCraken, No. W2001-03176-CCA-R3-CD, 2003 WL 1618082, at *5-6 (Tenn. Crim. App. Mar. 24, 2003) (discussing the principles set forth in Pierce, but distinguishing the facts of that case from Pierce, and reaching a conclusion that the felony murder conviction was supported by sufficient evidence).

Additionally, the Defendant contends that the State failed to negate his claim of self-defense because the evidence, "at the very least[,] created a reasonable doubt as to the issue." According to the Defendant, the State failed to show beyond a reasonable doubt that the Defendant was not acting in self-defense because (1) that State's key witness, Mr. Miller, could not tell the jury who fired first; (2) Mr. Harris testified that he felt like his life was threatened by Mr. Minter's threatening stance in front of his vehicle; (3) the surveillance video showed Mr. Minter's pointing his gun at Mr. Harris's vehicle, and due to this video's quality, the Defendant was not observable inside Mr. Harris's car; and (4) the 9mm shell casing found at the scene indicated that Mr. Minter must have shot at Mr. Harris's vehicle before being killed. The States responds that "ample evidence" supported the jury's rejection of the Defendant's self-defense claim.

In this case, the Defendant claimed self-defense, and the trial court instructed the jury on self-defense. As relevant and instructed here,

> [A] person who . . . is in a place where the person has a right to be [may use force] intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> (C) The belief of danger is founded upon reasonable grounds.

- 15 -

Tenn. Code Ann. § 39-11-611(b)(2)(A)-(C). Moreover, the use of force against another is not justified

> [i]f the person using force provoked the other individual's use or attempted use of unlawful force, unless: (A) The person using force abandons the encounter or clearly communicates to the other the intent to do so; and (B) The other person nevertheless continues or attempts to use unlawful force against the person.

Tenn. Code Ann. § 39-11-611(e)(2).

When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Encompassed within that determination is whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. June 25, 1998) (citing State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995)). It is within the prerogative of the jury to reject a claim of self-defense. See Goode, 956 S.W.2d at 527. Upon our review of a jury's rejection of a claim of self-defense, "in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994)

Here, none of the State's witnesses could equivocally say who fired the first shot, and the surveillance video also did not provide any clear proof in that regard. All that was clear from the evidence was that both Mr. Minter and the Defendant fired their respective weapons, though the Defendant fired more shots. However, Mr. Miller testified that he was robbed by the Defendant at gunpoint and that Mr. Minter could see what was occurring from the adjacent vehicle. Moreover, the video depicted Mr. Minter's backing away from Mr. Harris's vehicle after he exited Mr. Miller's Hyundai. Although Mr. Minter was backing away, the Defendant moved over to the passenger's side of Mr. Harris's backseat, put his weapon outside of the window, and shot in Mr. Minter's direction, hitting him in the head. While Mr. Harris testified that a bullet struck his Altima, there was no indication of where the bullet hit the car. The entire encounter was brief in nature, and the shooting occurred just moments after Mr. Miller exited from the backseat of Mr. Harris's vehicle.

The jury, as was it prerogative, was free to reject the credibility of the Defendant's statement, wherein he said that Mr. Minter fired first and that the Defendant had to reach

- 16 -

into his backpack to retrieve his weapon. The Defendant also points out that Mr. Miller's trial testimony differed from his police statement and from the trial testimony of Mr. Harris. However, the jury resolved any credibility issues in favor of the State and rejected the Defendant's self-defense claim.

Moreover, the Defendant's use of force was not justified because the jury could reasonably conclude that the Defendant provoked Mr. Minter's use of force by stealing marijuana from Mr. Miller at gunpoint and the cussing, "b---hing," and wrestling that ensued. The Defendant did not abandon the encounter or clearly communicate an intent to do so. Here, the Defendant was not without fault in the encounter. See Lester, 1998 WL 334394, at *2; see also State v. Markist Kantrell Cole, No. W2019-00079-CCA-R3-CD, 2020 WL 1547845, at *11 (Tenn. Crim. App. Apr. 1, 2020) (noting that the defendant "was not without fault in the encounter because he turned and walked toward the victim when the victim came outside, engaging further rather than continuing to walk away"). We believe that the evidence was sufficient for the jury to reject the Defendant's claim of self-defense. The Defendant is not entitled to relief.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

D. KELLY THOMAS, JR., JUDGE